IN THE UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF GEORGIA
NEWNAN DIVISION

KEVIN SHERMAN, MARY
SHERMAN, the father and mother
of Chase Sherman, and the ESTATE
OF CHASE ALAN SHERMAN,

     Plaintiffs,

                                           Civil Action No.
v.                                    3:16-CV-201-TCB

JOSHUA SEPANSKI, SAMUEL SMITH,
and DANIEL ELLIOT, in their
Individual Capacities,

     Defendants.

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1. This lawsuit is brought by the parents of Chase Sherman.  He died on November 20, 2015, as the result of the use of excessive force by the Defendants through repeated firing of tasers into Chase Sherman's body even after he was being prevented from breathing.

### JURISDICTION AND VENUE

2.  Plaintiffs present their claims for denial of federal civil rights against Defendants Joshua Sepanski, Samuel Smith and Daniel Elliot pursuant to 42

U.S.C. § 1983.  Federal jurisdiction is conferred by 28 U.S.C. § 1331 and § 1343(3) and by 28 U.S.C. § 1367.   Chase Sherman's parents will present claims on behalf of the Estate of Chase Sherman following the completion of the requisite filings in the appropriate probate court.

3. The Defendants caused Chase Sherman's death in Coweta County, Georgia; venue is appropriate in the United States District Court for the Northern District Georgia pursuant to 28 U.S.C. § 1391(b)(2).

## PARTIES

4.  Kevin Sherman is the father of Chase Sherman; Mary Sherman is Chase Sherman's mother.

5.  The Estate of Chase Alan Sherman has been properly established by law, and is represented herein by Kevin Sherman, the Personal Representative of the Estate.

6.  At all times pertinent hereto Joshua Sepanski was a law enforcement officer employed by the Coweta County, Georgia, Sheriff's Department and, for purposes of 42 U.S.C. 1983, acted under color of state law.

7.  At all times pertinent hereto, Samuel Smith was a law enforcement officer employed by the Coweta County, Georgia, Sheriff's Department and, for purposes of 42 U.S.C. 1983, acted under color of state law.

8. At all times pertinent hereto, Daniel Elliot was an employee of the Coweta County Fire Department serving in the capacity of an Emergency Medical Technician and, for purposes of 42 U.S.C. 1983, acted under color of state law.

9. Daniel Elliot was not a law enforcement officer in November of 2015.

10. During the events described in this Complaint, Daniel Elliot was not vested with the authority of law enforcement officers to make arrests nor to use force during the course of making arrests.

11. During the events described in this Complaint, Daniel Elliot was not vested with the discretionary authority to engage in law enforcement functions.

## FACTUAL BACKGROUND

## TASERS

12. On the evening of November 20, 2015, Sepanski and Smith each used Taser Model X26's against the body of Chase Sherman.  Each of them fired their tasers multiple times into Chase Sherman.  The Model X26 is manufactured by Taser International, Inc., hereinafter, TASER.

13. The Taser fires two small dart-like electrodes, each of which stays connected to the main unit by a conductive wire as they are propelled by small nitrogen charges.  The electrodes are pointed to penetrate clothing and barbed to prevent removal once they are in place.

14. The X26 is designed to pulse about 19 times a second through a five-second "cycle." Pulling and releasing the trigger fires the darts and initiates a five-second cycle that can be terminated earlier by engaging the safety and repeated by pulling the trigger again after a cycle ends. Cycles are prolonged when the user holds the trigger longer than five seconds. The time and duration of each cycle is recorded on a chip in the X26 called the "dataport," which can be downloaded to document the time, number and duration of discharges.

15. If the cartridge is removed, then pulling the Taser trigger cycles electricity between two electrodes, which can then be pressed against a person's skin, causing a painful burning sensation, a tactic known in law enforcement circles as a "drive stun." Drive stuns can also be applied through an expended cartridge.

16. For various reasons, it is unsafe to repeatedly shock an individual. TASER has issued a training bulletin explaining that multiple applications may impair breathing and respiration. See, Police Liability and Risk Management: Torts, Civil Rights, and Employment Law, By Robert J Girod, CRC Press, 2013, page 114.

17. TASER has warned of risks from repeated deployments. As recently as 2013, Taser International warned, "Drive-stun use may not be effective on

emotionally disturbed persons or others who may not respond to pain due to a mind-body disconnect."  See, Cheryl W. Thompson & Mark Berman, *Stun guns: 'There was just too much use,'* Wash. Post, Nov. 27, 2015, at A1.  Taser users, the warning goes on, should "[a]void using repeated drive stuns on such individuals if compliance is not achieved."   See, *Armstrong v. The Village of Pinehurst, et.al.*, 810 F.3d 892, 903 (4th Cir., 2016).

18. Since at least 2011, the Police Executive Research Forum ("PERF") and the Department of Justice's Office of Community Oriented Policing Services ("COPS") have cautioned that using drive stun mode "to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation." PERF & COPS, *2011 Electronic Control Weapon Guidelines*, at 14 (March 2011) (emphasis omitted).  Id.

19. [intentionally left blank]

## POSITIONAL AND RESTRAINT ASPHYXIA

20. On the evening of November 20, 2015, the Defendants worked together to apply physical force to Chase Sherman that interfered his capacity to breathe and, ultimately, prevented him from breathing.

21. When police officers restrain someone that they are arresting in such a strenuous manner as to prevent the person from breathing, it is often referred to in the medical and law enforcement community as restraint asphyxia.

22. Restraint asphyxia can cause death; it is a form of deadly force.

23. When police officers restrain someone they are arresting or controlling in such a manner that the position of the person's body constrains or retards the person's capacity to breathe, it is referred to as positional asphyxia.

24. Positional asphyxia can cause death.

25. The risk that death can result from restraint asphyxia and positional asphyxia is well known within the law enforcement community.

26. For example, not later than 2001 the Georgia Bureau of Investigation produced a training video entitled "Preventing Restraint Asphyxia."

27. The Video warned that excessive restraint by officers when combined with conditions, such as a prolonged physical struggle and the mental condition of the person being arrested, can lead to restraint asphyxia.

28. The Video warns if a struggle with person being arrested continues for longer than three minutes, there is a risk of in custody death.

29. Officers are warned to avoid placing weight onto the back of the person being arrested because it can cut off the flow of oxygen to the lungs and are

advised that once the person being arrested becomes less combative, the officer needs to reduce the use of force and advised that a drop in resistance might mean a loss of oxygen and consciousness.  Officers are told that once the prisoner is under control, do not continue to compress the chest or leave the prisoner lying on their stomach.

30. Beginning not later than July of 2006, the training manual used by the Georgia Peace Officers Standards Training Council warned of the danger of positional asphyxia.  Within that manual, trainees are warned to avoid positional asphyxia: when arresting someone, as soon as the person is handcuffed, they are to get him off his stomach.  And if the person continues to struggle while handcuffed, "*do not sit on his back*."

31. Chase Sherman is dead not simply because the Defendants used excessive force against him.

32. Chase Sherman is dead because the Defendants did not follow the well-known guidelines and warnings within the law enforcement community which are taught in order to avoid in custody death.

33. Chase Sherman is dead because Daniel Elliot did not apply the knowledge that any reasonably trained EMT has - to the effect that the prolonged constriction of the breathing capacity of a person can result in their death.

## FACTS LEADING TO THE DEATH OF CHASE SHERMAN

34. On the evening of November 20, 2015, Chase Sherman was riding in the rear of a motor vehicle traveling south on Interstate Highway 85 in Coweta County, Georgia.

35. Kevin Sherman, Mary Sherman and Patricia Galloway were in the vehicle with Chase Sherman.

36. Defendants JOSHUA SEPANSKI and SAMUEL SMITH were on duty and working in their capacities as Deputies of the Coweta County, Georgia, Sheriff's Department.

37. Defendant DANIEL ELLIOT was on duty and working in his capacity as an Emergency Medical Technician for the Coweta County Fire Department.

38. As the motor vehicle was being driven, Chase Sherman acted in an erratic manner, including insisting that he needed to get out of the vehicle and thinking that his father was someone other than who he was.

39. As a result, the motor vehicle was pulled off to the side of the interstate highway, out of the lane of traffic.

40. Mary Sherman placed a call to 911 for assistance.

41. As a result of the Sherman call to 911, Sepanski and Smith came to the location where the vehicle was pulled off to the side of the highway.

42. Sepanski had the first contact with Chase Sherman.   Sepanski spoke with Chase Sherman from the outside of the vehicle.

43. When he first encountered Chase Sherman, Kevin Sherman and Mary Sherman were each inside the vehicle.

44. At or about the time that Smith reached the vehicle, Kevin Sherman exited the vehicle and Sepanski entered it.

45. Sepanski handcuffed each of Chase Sherman's wrists.

46. At or about this time, Smith moved to the driver's side of the vehicle and observed Sepanski and Chase Sherman together in the rear section of the vehicle.

47. Following being handcuffed, Chase Sherman sat handcuffed in the driver's side rear passenger seat with his two bare feet propped onto the back of the driver's seat, knees close to his chest.

48. Either Sepanski or Smith radioed that "we have the subject handcuffed at this time."

49. After handcuffing Chase Sherman, Sepanski drew his Taser and pointed it at very close range towards Chase Sherman.   Sepanski was inside of the vehicle at this time.

50. Smith moved away from the vehicle and spoke with Kevin Sherman, asking questions about, among other things, what events led up to the vehicle being driven out of the lane of traffic and onto the side of the roadway.

51. About a minute and a half after one of the officers radioed that "we have the subject handcuffed at this time," Smith returned to the driver's side of the vehicle.  At that time, Chase Sherman remained seated in the left passenger side of the rear section of the vehicle, still handcuffed.

52. After Smith returned to the driver's side of the vehicle, Sepanski declared to Chase Sherman: "If you move I'm going to tase you."

53. Smith then moved from the driver's side of the vehicle to the passenger side of the vehicle, and then back to the passenger side, at which point he directed his taser towards Chase Sherman's body at close range.

54. Approximately twenty seconds after declaring that "if you move I'm going to tase you," Sepanski yelled out, "Tase him," and at or about that moment, Smith fired his Taser into Chase Sherman.  This use of the Taser propelled prongs from the Taser into Chase Sherman's body and ran an electrical current through his body.

55. Approximately twenty seconds after Sepanski yelled out the words, "Tase him," Chase Sherman was forced by Sepanski onto his back, into the seat cushion of the rear passenger area.

56. Chase Sherman stopped his movements and became still.

57. Chase Sherman declared "ok," while in this position, as Sepanski forced his hand into Chase Sherman's upper chest/windpipe area.

58. Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith at this time.

59. Approximately fifteen seconds later Sepanski continued to apply force with his left hand into Chase Sherman's windpipe area while holding his Taser in his right hand, pointing his Taser at Chase Sherman.

60. Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith at this time.

61. Chase Sherman began to speak unintelligibly at this point.

62. About twenty seconds later, Chase Sherman began to move about in an agitated manner.  Both officers grabbed at Chase Sherman in an effort to gain control over him.

63. At this point, Chase Sherman was facing up into the interior of the back section of the vehicle.

64. About fifteen seconds after the agitated movements of Chase Sherman began, he stopped his agitated movements and stated to the officers, "Ok; I quit."

65. Each of the deputies heard him say "I quit."

66. Immediately after Chase Sherman declared that he quit, Sepanski forced his Taser into Chase Sherman's torso and discharged the Taser for a prolonged period of time.

67. The discharge of the Taser resulted in further movement by Chase Sherman, followed by additional discharges of one or both of the Deputies' tasers.

68. Chase Sherman's body convulsed from the successive and concurrent Taser discharges.

69. Daniel Elliot entered the vehicle through the front passenger side door. He asked "What do you need me to do?" and grabbed Chase Sherman and applied pressure to Sherman's body.

70. Smith, Elliot and Sepanski then rolled Chase Sherman onto the floor section of the rear compartment resulting in Chase Sherman being forced face down.

71. Once Chase Sherman was rolled face down, Sepanski applied pressure onto his back.  Elliot pressed his hand onto the back of Chase Sherman's neck.

72. Chase Sherman was wedged between the back of the front passenger seat and the base of the seat of the rear passenger seats.

73. Once wedged into this position, Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith or Elliot.

74. When wedged into this position, Chase Sherman remained handcuffed. He did not have possession of any weapon.  He was subdued by the Defendants and under their control.

75. After being rolled into this position, Chase Sherman stated, "I quit."

76. Once wedged into this position, Smith exited the driver's side of the rear section of the vehicle, walked to the rear of the vehicle and then returned.

77. When Smith returned, Chase Sherman was in the same physical position. Smith placed his Taser to the small of Chase's back and, at the same time, Sepanski had his Taser positioned at the base of the back of Chase's neck.

78. Sepanski declared to Chase Sherman that he "stay down there, don't move." After Sepanski made that statement, Elliot declared "I got him pinned; he can't come up."

79. When Elliot made that statement, he was applying force onto Chase Sherman's back, forcing Chase into the floorboard and into the hump in the floor

housing the drive train of the vehicle, constricting Chase's capacity to breathe. Sepanski was also applying pressure into Chase Sherman's back.

80. When Elliot made the statement that Chase Sherman "can't come up," Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith or Elliot.

81. Sepanski declared to Elliot to "get some weight on him, get some fucking weight on him right now," and taped his hand onto Chase Sherman's back.

82. At or about that time, Chase Sherman stated, "I give."

83. After Sepanski declared to Elliot to "get some fucking weight on him right now," Sepanski and/or Smith again discharged their Taser weapon into Chase Sherman's body.

84. At or about the conclusion of this additional discharge of the Taser weapon, Chase Sherman stated, "Ok."

85. After Chase Sherman stated, "Ok," Elliot told Sepanski that "I've got him real good right here...."

86. Approximately twenty seconds after Sepanski told Elliot to "get some fucking weight on him right now," Elliot shifted the way that he was applying force into Chase Sherman's back by moving his knee directly onto Chase

Sherman's back.  When he did so, he applied further force into Chase Sherman's back, continuing to constrict his capacity to breathe.

87. As Elliot applied pressure with his knee, Sepanski put his hand to the back of Chase Sherman's head and forced it towards the floor.

88. At this time, Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith or Elliot

89. Sepanski spoke, telling Chase Sherman to "Relax!"

90. As Elliot applied pressure with his knee, he arched his back to place it flush with the ceiling of the vehicle, enabling him to apply even greater force to Sherman's back.  From that position Elliot applied even more force to Sherman's back, further constricting his ability to breathe.

91. At or about the time that Elliot had his back flush with the ceiling, and approximately twenty seconds after telling Sepanski that he "got him good right here," Elliot stated that "he's good now ... he [referring to Chase Sherman] got all the weight of the world on him now..."

92. At this time, Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith or Elliot.

93. Elliot declared [referring to Chase Sherman] that "he can't come up." Chase Sherman called out, saying something to the effect that he could not breathe. Sepanski declared, "Stop Resisting."

94. As Sepanski activated his Taser again Chase said the words, "I'm dying."

95. Elliot declared that "he can't come up...; I have my back against the roof...knee against his back ...it aint hurting; he can't come up, ok?"

96. At this time, Chase Sherman was not resisting or forcibly moving against either Sepanski or Smith or Elliot.

97. As the three Defendants continued to apply force onto Chase Sherman, and - in particular – applied the force to his back which constricted and prevented him from breathing, Elliot stated that "I've got a good hold on him now...straight down."

98. As Elliot spoke Chase Sherman emitted a whining crying kind of sound, as he was unable to breathe properly and was dying.

99. For another minute and a half, Sepanski and Elliot continued to press down onto Chase Sherman's back with their knees.  Sepanski forced Chase Sherman's head downward.

100. As they remained in this position, one of the officers declared to Chase Sherman to "just relax..."

101. At and about this time, Chase Sherman became silent, lifeless and completely still.

102. Approximately four and one half minutes after Elliot declared that he "got him, face down," Sepanski realized that Sherman had become lifeless and stated, "you good buddy?"

103. Sepanski's question to Sherman was approximately three and a half minutes after Elliot had declared to him that he "had [Sherman] pinned, he can't come up."

104. Sepanski and Elliot each then called to Chase Sherman to "say something," and received no response from Chase Sherman's lifeless body.

105. After checking for but not locating a pulse, Elliot and Sepanski, with the assistance of one of the other officers who had responded to the vehicle in the meantime, pulled Chase Sherman from the vehicle and placed him onto the highway.

106. Soon thereafter, Chase Sherman's body was lifted from the pavement onto a flat board and moved into a nearby EMT mobile unit where Emergency medical measures were applied to Chase Sherman.

107. Chase Sherman was pronounced dead on November 20, 2015, at approximately 10:14 p.m.

108. Chase Sherman died during the use of multiple discharges of the Tasers by Defendants Smith and Sepanski and he died as a result of the forcible prone positioning of his body onto the floor of the motor vehicle and the concurrent compression of his body with the body weight of the Defendants.

109. Chase Sherman suffered excruciating pain and immediate foreknowledge of his own death while being restrained by the Defendants.

110. Following his death, Mary Sherman and Kevin Sherman made the necessary arrangements for their son's last expenses - funeral and burial.

111. Up to the point in time at which Daniel Elliot attempted to determine whether or not Chase Sherman continued to have a pulse, he did not take any action which constituted the rendering of medical diagnosis or service.

112. The actions of Daniel Elliot up to the point in time at which he attempted to determine whether or not Chase Sherman continued to have a pulse consisted of the use of force to physically subdue a person being taken into police custody.

113. Those actions of Daniel Elliot were not within the discretionary functions of Daniel Elliot's duties and obligations as an EMT and are actions for

which he is precluded from asserting qualified immunity from suit brought

pursuant to 42 U.S.C. 1983.

## CAUSES OF ACTION

114. The Defendants, and each of them, breached the Fourth Amendment's

prohibition against unreasonable seizures by engaging in the use of excessive force

upon Chase Sherman which resulted in his harm and his death.

115. The Defendants, and each of them, violated Chase Sherman's

affirmative rights as guaranteed by the Constitution and laws of Georgia - rights to

be free from abuse while in custody and to be free from unjustified force.

## Qualified Immunity

116. Not later than the point in time at which the Defendants had Chase

Sampson "face down" and securely held in their grasp, he was effectively

immobilized and posed no immediate threat to the Defendants or others.

117. At all times pertinent hereto the law was clearly established that the

repeated use of a Taser on a person who has been taken into custody after his

physical capitulation to the officers is constitutionally unreasonable. *Oliver v.*

*Fiorino*, 586 F.3d 898 (11th Cir. 2009).

118. At all times pertinent hereto, the law is clearly established that a person

who has been handcuffed, who was not a flight risk and who is not an active threat

to the arresting officers is not to be subjected to violent force. *Lee v. Ferraro*, 284

F.3d 1188 (11th Cir. 2002).

## **Damages**

119. The actions of Defendants, jointly and severally, proximately caused

the loss of Chase Sherman's life and, as a result, the parents of Chase Sherman are

jointly entitled to recover the full value of his life.

120. The actions of the Defendants, jointly and severally, proximately

caused Chase Sherman to endure pain and suffering prior to his death, and resulted

in the necessity of incurring end of life expenses associated with his funeral and

burial.

## **PRAYER FOR RELIEF**

On the basis of the foregoing, the Plaintiffs respectfully demand a Jury Trial,

and pray that this Court award the following relief from the Defendants:

a. Damages against the Defendants in an amount appropriate to compensate

for the full value of the life of Chase Sherman, without deduction for the

necessities of life or funeral expenses;

b.  Damages against the Defendants in an amount appropriate and reasonable

to compensate the Estate of Chase Sherman for the pain and suffering which he

endured prior to his death, and for the expenses incurred in connection with the

funeral and burial of Chase Sherman;

b. Whatever other damages or costs are recoverable under federal law,

including attorneys' fees and costs of litigation; and

c. Such other and further relief as to this Court is deemed just and proper.

This the 12th day of July, 2017.

S/ Brian Spears
Bar No. 670112
Attorney for Plaintiffs

1126 Ponce de Leon Avenue
Atlanta, Georgia 30306
404-872-7086 (voice)
404-892-1128 (facsimile)
bspears@mindspring.com

S/ L. Chris Stewart
Bar No. 142289
Atttorney for Plaintiffs

Stewart, Seay & Felton
260 Peachtree Street, N.E., Suite 1001
Atlanta, GA 30303
(404) 637-0240 (voice)
info@ssfjustice.com

S/ Eugene Felton, Jr.
Bar No. 257840
Atttorney for Plaintiffs

Stewart, Seay & Felton
260 Peachtree Street, N.E., Suite 1001
Atlanta, GA 30303
(404) 637-0240 (voice)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2017, I electronically filed the attached with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Harvey S. Gray, Esq.
Dianna J. Lee, Esq.
Gray, Rust, St. Amand, Moffett & Brieske, L.L.P.
1700 Atlanta Plaza
950 East Paces Ferry Road
Atlanta, GA 30326

Thomas M. Mitchell, Esq.
Carothers & Mitchell, LLC
1809 Buford Highway
Buford, GA 30518

L. Chris Stewart
Eugene Felton
Stewart, Seay & Felton
260 Peachtree St., NW, Suite 1001
Atlanta, GA 30303

<u>S/BRIAN SPEARS</u>, ECF-Registered Attorney
Georgia Bar No. 670112
Attorney for Plaintiffs
1126 Ponce de Leon Avenue
Atlanta, GA 30306
Telephone: (404) 872-7086
Email: Bspears@mindspring.com